UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARC EVERETT MD PC,

                         *Plaintiff*,

        -against-

UMR, INC.,

                         *Defendant*.

22-CV-4856 (ARR) (AYS)

**OPINION & ORDER**

ROSS, United States District Judge:

Plaintiff, Marc Everett, M.D., on behalf of his patient ("Patient"), brings this action against Defendant, UMR, Inc. ("UMR") alleging that UMR underpaid healthcare benefits in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Patient was a member of her employer's Affinity Federal Credit Union Benefit Plan (the "Plan"), and UMR was the Plan's third-party claims administrator. Following an unsuccessful appeal through UMR's internal dispute process, Dr. Everett initiated this action for the balance of the bill.

UMR now moves for summary judgment, arguing that its final benefits determination was based on its reasonable interpretation of the Plan. Challenging UMR's assessment of reasonableness, Dr. Everett also moves for summary judgment, arguing that UMR's benefits determination was arbitrary and capricious. For the following reasons, I deny UMR's motion for summary judgment and grant Dr. Everett's cross-motion for summary judgment.

## BACKGROUND

The following facts are derived from the parties' exhibits, memoranda, and respective Local Rule 56.1 Statements of Facts. Unless otherwise noted, the facts as recounted here are

1

undisputed. All evidence is construed in the light most favorable to the non-moving party. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

Dr. Everett performed a bilateral breast reduction on Patient at Syosset Hospital on January 11, 2021. Pl.'s 56.1 ¶ 1; Def.'s 56.1 ¶ 23. At the time of the treatment, the Patient was a beneficiary of the Plan, an employer-based health insurance plan for which Affinity Federal Credit Union served as Plan Administrator. Def.'s 56.1 ¶ 4. Dr. Everett was an out-of-network medical provider, Pl.'s 56.1 ¶ 3; Def.'s 56.1 ¶ 25, and the parties do not dispute that the procedure was a covered benefit under the Plan. Def.'s 56.1 ¶ 7. The language of the Plan specifies that the Plan Administrator delegated its authority to process medical claims to defendant UMR, which serves as the Plan's third-party plan administrator. Pl.'s 56.1 ¶¶ 4–5; Def.'s 56.1 ¶¶ 5–6. The Plan states that "[a]ny interpretation, determination or other action of the Plan Administrator or the Third Party Administrators shall be subject to review only if a court of proper jurisdiction determines its action is arbitrary or capricious or otherwise a clear abuse of discretion." *Id.* ¶ 6.

## A. Out-Of-Network Plan Provisions

The Plan states that covered expenses received from out-of-network providers will be processed in accordance with out-of-network benefit levels listed on the Plan's schedule of benefits. Def.'s 56.1 ¶ 7. It specifies that out-of-network providers charge normal rates for services, "so Covered Persons may need to pay more." *Id.* After the Plan pays its portion, the covered person is responsible for paying the balance of the claims. *Id.*

Under the section of the Plan titled "How Health Benefits Are Calculated," the Plan states that "UMR will establish the allowable payment amount for [a covered benefit], in accordance with the provisions of this [Summary Plan Description]." Pl.'s 56.1 ¶ 6; Def.'s 56.1 ¶ 8. The Plan provides the following basis for how the allowable payable amount is established:

2

> Claims for covered benefits are paid according to the billed charges, a Negotiated Rate, the Reasonable Reimbursement, or based on the Usual and Customary amounts, minus any Deductible, Plan Participation rate, Co-pay, or penalties that the Covered Person is responsible for paying.

*Id.* The two terms especially relevant for out-of-network billing are "Reasonable Reimbursement" and "Usual and Customary." "Reasonable Reimbursement" is defined as "the amount the Plan determines to be the reasonable charge, allowing for variance of reimbursement among provider types and geographical adjustments where market conditions suggest it appropriate." Pl.'s 56.1 ¶ 8; Def.'s 56.1 ¶ 10. "Usual and Customary" is defined as "the amount the Plan determines to be the reasonable charge for comparable services, treatment, or materials in a Geographical Area," which is defined as "a zip code area, or a greater area if the Plan determines it is needed to find an appropriate cross section of accurate data." Pl.'s 56.1 ¶ 9. The Plan instructs that, "[i]n determining whether charges are Usual and Customary, due consideration will be given to the nature and severity of the condition being treated and any medical complications or unusual or extenuating circumstances." *Id.*

The Summary Plan Description states that if a claim is submitted and the Plan does not completely cover the charges, resulting in an "Adverse Benefit Determination," Def.'s 56.1 ¶¶ 17–21, the covered person will receive an Explanation of Benefits ("EOB") form that will explain how much the Plan paid toward the claim, and how much of the claim is the patient's responsibility due to cost-sharing obligations, non-covered benefits, penalties or other Plan provisions. ECF No. 56-4 at 92. An "Adverse Benefit Determination" is defined as "a denial, reduction, . . . or a failure to provide or make payment, in whole or in part, for a benefit." *Id.* at 94. The Plan states that the EOB form will:

- Explain the specific reasons for the denial.
- Provide a specific reference to pertinent Plan provisions on which the denial was based.

- Provide a description of any material or information that is necessary for the Covered Person to perfect the claim, along with an explanation of why such material or information is necessary, if applicable.
- Provide appropriate information as to the steps the Covered Person can take to submit the claim for appeal (review).

*Id.* The covered person can then undergo an appeal procedure and request that the Plan review its initial determination. Def.'s 56.1 ¶¶ 17–21. After completing all mandatory appeal levels, covered persons may further appeal by bringing a civil action under ERISA. *Id.* ¶ 22.

For out-of-network service providers, the Plan provides for a "Plan Participation Rate" of 70% after satisfaction of the annual deductible by the Plan member. Pl.'s 56.1 ¶¶ 10-11; Def.'s 56.1 ¶¶ 13-14. Similarly, for out-of-network providers of hospital services, the Plan provides for the reimbursement of 70% of billed charges related to inpatient services and outpatient surgery after satisfaction of the annual deductible. Pl.'s 56.1 ¶ 12; Def.'s 56.1 ¶ 14. This means that Plan terms require the plan beneficiary to pay 30% of the allowed amount rendered by out-of-network providers of such services. Def.'s 56.1 ¶ 32. The Plan includes a provision titled "No Forgiveness of Out-of-Pocket Expenses" that states:

> The Covered Person is required to pay the out-of-pocket expenses (including Deductibles, Co-pays or required Plan Participation) under the terms of this Plan. The requirement that You and Your Dependent(s) pay the applicable out-of-pocket expenses cannot be waived by a provider under any "fee forgiveness", "not out-of-pocket" or similar arrangement.

Def.'s 56.1 ¶ 16. The section warns that a "Covered Person's claim may be denied and the Covered Person will be responsible for payment of the entire claim" if a provider waives required out-of-pocket expenses. *Id.* The claim may be reconsidered if proof is provided that out-of-pocket expenses were appropriately paid. *Id.*

**B. The Claim Process and Appeal**

Following the surgery, Dr. Everett submitted medical billing for the services he performed for the Patient, seeking payment totaling $120,000 from defendant UMR. Def.'s 56.1 ¶ 24; Pl.'s 56.1 ¶ 13. To manage the claim and calculate the appropriate reimbursement for the Patient's procedure, UMR referred the claim to Change Healthcare, an affiliated advanced claim management vendor. Def.'s 56.1 ¶ 25. Change Healthcare then requested that its affiliate Clear Health Strategies ("Clear Health"), a pricing vendor specializing in pricing claims submitted by out-of-network providers, price the claim. Id. ¶ 26.

Clear Health priced the claim at 150% of the rate set forth in the 2021 Centers for Medicare and Medicaid Services Physician Fee Schedule. Def.'s 56.1 ¶ 27; Pl.'s 56.1 ¶ 20. This amounted to $2,132.54. Id. UMR adopted Clear Health's pricing recommendation and issued an "Explanation of Benefit Form" to Patient dated April 13, 2021, that stated that the "Allowable Amount" under the Plan was $2,132.54. Def.'s 56.1 ¶ 31; Pl.'s 56.1 ¶¶ 14–15. The form explained that based on the 70% out-of-network reimbursement rate, the benefit available for the surgery was $1,492.72 (70% of $2,132.54), and that the Provider may bill Patient for the $639.76 difference. Def.'s 56.1 ¶¶ 32–33. The form explained that the "amount not payable" was $117,867.46, the remainder of Dr. Everett's $120,000 bill. Def.'s 56.1 ¶ 34; Pl.'s 56.1 ¶ 15.

While Dr. Everett and UMR dispute several facts regarding the appeal process, the following facts are undisputed. On May 3, 2021, Dr. Everett, through a representative at All Data Health, contacted UMR to state that he was underpaid for the services rendered. Def.'s 56.1 ¶ 41. It appears that UMR then referred Dr. Everett's challenge to Change Healthcare. Id. ¶ 52. On June 30, 2021, Change Healthcare reviewed Dr. Everett's challenge and again referred the challenge to its pricing vendor Clear Health. Id. ¶ 52–53. On July 1, 2021, Clear Health contacted Dr. Everett,

and informed him that the pricing provided—"at 150% of the CMS rate" ("CMS" referring to Centers for Medicare & Medicaid Services)—was the "Allowable Amount" pursuant to the Patient's Plan and that the pricing decision was upheld based on the Plan's terms. *Id.* ¶¶ 54–55.

In a letter dated July 1, 2021, UMR told Dr. Everett that "the claim was priced based on the maximum allowable amount per the plan and was processed according to plan benefits" and that further inquiries about the pricing of the claim should be directed to Change Healthcare. *Id.* ¶¶ 43–44. On July 14, 2021, the Patient contacted UMR regarding the pricing of the claim and was informed that Dr. Everett could dispute UMR's payment. *Id.* ¶¶ 45–46.

Dr. Everett submitted a letter to formally appeal UMR's benefits decision on July 15, 2021. Def.'s 56.1 ¶ 47; Pl.'s 56.1 ¶¶ 16-17. Dr. Everett told UMR that he was "willing to negotiate" and "expect[ed] at least [the] Fair health rate" as a basis for his appeal. Def.'s 56.1 ¶ 47. The parties agree that "Fair Health" refers to a nonprofit database that aggregates claims "to estimate what providers charge, and what insurers pay, for providing healthcare." Def.'s Reply at 4–5; Pl.'s Mot. at 9–10.

Following the appeal letter, the Patient and Dr. Everett's representative again contacted UMR regarding the pricing of the claim and was again directed to reach out to Change Healthcare. *Id.* ¶¶ 48–49. On October 27, UMR again informed Dr. Everett that "the claim was priced based on the maximum allowable amount per the plan and was processed according to plan benefits." Def.'s 56.1 ¶ 50; Pl.'s 56.1 ¶ 19. On November 10, 2021, Dr. Everett's representative contacted UMR and stated that she was informed that the claim was priced according to "150% of the Medicare rates," asked why the claim was priced that way, and suggested that this reimbursement rate did not comply with the Plan's terms regarding out-of-network billing. Def.'s 56.1 ¶ 51.

On or around March 2022, Clear Health offered Dr. Everett $5,686.76 of benefits, which was based on 400% of the Medicare rate. Def.'s 56.1 ¶ 60; Pl.'s 56.1 ¶ 23. Dr. Everett rejected Clear Health's offer, and the claim was closed on April 12, 2022. Def.'s 56.1 ¶ 61; Pl.'s 56.1 ¶ 28.

Dr. Everett filed a complaint in this court on August 17, 2022 against United Healthcare Insurance Company and UMR. *See* ECF No. 1. Dr. Everett filed an amended complaint on March 16, 2023, ECF No. 20 ("Amended Complaint" or "AC"), which UMR answered on May 30, 2023. ECF No. 24. United Healthcare Insurance Company was dismissed from the action on April 6, 2023. *See* Docket Entry dated April 6, 2023. Parties submitted fully briefed motions for summary judgment on August 8, 2024. *See* ECF Nos. 46, 47. The case was reassigned to me on August 25, 2025. *See* Docket Entry dated August 25, 2025.

## LEGAL STANDARD

"Summary judgment is appropriate only where the record shows 'that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 80 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A material fact is one that "can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). A genuine dispute is one that can "reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A district court may consider "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (citation omitted). Materials relied on at summary judgment need not be admissible in the form presented to the district court, and may be considered so long as they "contain evidence that will be presented in admissible form at trial." *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001).

The party seeking summary judgment carries the burden of proving that there is no genuine dispute of material fact, and the district court must draw all reasonable inferences in favor of the nonmoving party. *See Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223–24 (2d Cir. 1994). Nevertheless, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). The same legal standard applies when analyzing cross-motions for summary judgment. *See Schultz v. Stoner*, 308 F.Supp.2d 289, 298 (S.D.N.Y. 2004). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citations omitted). The Court is not required to grant summary judgment in favor of either moving party. *See Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

These principles governing summary judgment are equally applicable when it involves the review of an administrative record. *See Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (citing *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 575 (2d Cir. 2006)). "It is appropriate for courts reviewing a challenge of denial of benefits under ERISA to do so on a motion for summary judgment, which provides an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record." *Griffin v. New York State Nurses Ass'n Pension Plan & Benefits Fund*, 757 F. Supp. 2d 199, 208 (E.D.N.Y. 2010) (quotation marks omitted). "In an action brought under ERISA, the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA." *Ludwig v. NYNEX Serv. Co.,* 838 F. Supp. 769, 780 (S.D.N.Y. 1993). "[I]n a summary judgment motion, the arbitrary and capricious standard requires that the court ask

whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Id.* (alterations adopted).

## DISCUSSION

### I. ERISA Claim

#### A.  Legal Standard

The parties cross move for summary judgment on the single claim that Dr. Everett brings under ERISA Section 502(a)(1)(B), codified at 29 U.S.C. § 1132(a). AC ¶¶ 20–26; Def.'s Mot. at 1; Pl.'s Mot. at 1. Under that provision, a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132.

A review of the reasonableness of a benefits determination is generally limited to the administrative record, which is comprised of the information that was before the claims fiduciary when it considered the benefits claim. *See Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 125 (2d Cir. 2003). "[W]hen reviewing claim denials, whether under the arbitrary and capricious or *de novo* standards of review, district courts typically limit their review to the administrative record before the plan at the time it denied the claim." *Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 60 (2d Cir. 2016). The Second Circuit has held that a "district court's decision to admit evidence outside of the administrative record is discretionary, but [such] discretion ought not to be exercised in the absence of good cause." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008) (affirming district court's decision to admit and rely upon materials outside the administrative record) (internal quotation marks and citation omitted). "[I]t

is appropriate to allow the introduction of additional evidence if the plan's compliance failures adversely affected the development of the administrative record." *Halo*, 819 F.3d at 60.

Here, the administrative record of Patient's claim can be found at Exhibit A and Exhibit B to the Declaration of Scott Ziemer, dated June 24, 2024. Def.'s Mot. at 14; Ex. A, ECF No. 46-4; Ex. B., ECF No. 46-5. Exhibit A consists of a copy of the Summary Plan Description ("SPD") for the Plan at issue and Exhibit B consists of the Patient's claim file ("Claim File"), which includes copies of the Patient's health insurance form, UMR's explanation of benefits notice, UMR's internal notes on the claim, and a communication log between Dr. Everett, Change Healthcare, and Clear Health.

The standard governing the review of an administrator's interpretation of an ERISA benefit plan was first articulated by the Supreme Court in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). The Court explained that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. Where such authority is given, the administrator's interpretation is reviewed for an abuse of discretion. *Id.*

Following the Supreme Court's reasoning, the Second Circuit has held that "plans investing the administrator with broad discretionary authority to determine eligibility are reviewed under the arbitrary and capricious standard." *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 145 (2d Cir. 2003) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. at 115); *see also McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 130 (2d Cir. 2008) ("[I]n cases in which an abuse of discretion standard of review applies . . . we will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious."). "Under the arbitrary and capricious standard of review, [a court] may overturn a decision to deny benefits only if it was 'without reason,

10

unsupported by substantial evidence or erroneous as a matter of law.'" *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995). "Substantial evidence . . . is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker and requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (quotation marks omitted and alterations adopted). The Second Circuit has stressed that courts are "not free to substitute their own judgment for that of the plan administrator as if they were considering the issue of eligibility anew." *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003) (alterations adopted).

Here, the Plan explicitly vests the Plan Administrator with "discretionary authority to interpret all plan documents . . . and make all interpretive and factual determinations as to whether any individual is entitled to receive any benefit under the terms of this Plan." SPD at 7. Furthermore, the parties agree that the Plan Administrator was vested with discretionary authority to interpret the Plan regarding medical claims, Def.'s Mot. at 5; Pl.'s Mot. at 7, and argue in their briefing under the arbitrary and capricious standard. *See Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d at 145–46. Therefore, applying the "arbitrary and capricious standard of review," I may overturn the Plan Administrator's decision "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan*, 52 F.3d at 442 (quotation marks omitted).

Dr. Everett's additional argument that the Plan Administrator's benefits determination should be subject to *de novo* review because the determination's reasonableness concerns "the interpretation of . . . unambiguous Plan terms," Pl.'s Opp at 8–9; Pl.'s Mot. at 6–7, fails because the benefits claim was a discretionary determination based on ambiguous plan language. *See Cannady v. Bd. of Trs. of Boilermaker-Blacksmith Nat'l Pension Tr.*, No. 20-3141-CV, 2022 WL

151298, at *2 (2d Cir. Jan. 18, 2022) ("Although we conduct review under the arbitrary and capricious standard for discretionary determinations, such as those based on ambiguous language, we subject the determination that an ERISA plan provision is unambiguous to *de novo* review.") (quotation marks omitted). Here, the issue in dispute is not whether the ERISA plan provision governing the calculation of health benefits is ambiguous or unambiguous, but whether the Plan Administrator interpreted the provisions related to out-of-network benefits unreasonably. Indeed, the Plan provisions in question governing reimbursement for covered out-of-network services meet *Cannady*'s definition of ambiguous language—that "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* To that end, I look to the administrative record for substantial evidence that a "reasonable mind" might accept as adequate to support UMR's benefits determination. *Miller v. United Welfare Fund*, 72 F.3d at 1072.

### B. Application

Based on my review of the administrative record, Clear Health's pricing of the Patient's claim at 150% of the Medicare rate is not supported by substantial evidence.[1] However, Dr.

---

[1] Courts distinguish between "amount-of-payment" claims, which are not preempted by ERISA and should be brought under state contract claims, and "right-to-payment" claims which are preempted by ERISA. Even though Dr. Everett is contesting that he was underpaid for the services he rendered on the Patient, this is a "right-to-payment" claim because the disposition of this actions turns on what the Plan's terms required. *See Cooperman v. Empire HealthChoice HMO, Inc.*, No. 1:24-CV-00866, 2025 WL 950675, at *19 (S.D.N.Y. Mar. 28, 2025) ("The appropriate reimbursement due to the Practice under these provisions, as an out-of-network provider who rendered medically necessary procedures, is therefore still a coverage determination . . . [and] the court must still 'interpret contested terms of an ERISA-governed plan.'") (citing *Long Island Thoracic Surgery, P.C. v. Bldg. Serv. 32BJ Health Fund*, No. 17-CV-00163, 2019 WL 7598669, at *14 (E.D.N.Y. Sept. 3, 2019), *report and recommendation adopted*, 2019 WL 5060495 (E.D.N.Y. Oct. 9, 2019)).

Everett's reference to the "Fair Health" rate as the appropriate metric for the reasonableness of the $120,000 bill is also not supported by the administrative record. Therefore, I remand the claim back to the Plan Administrator for a benefits determination consistent with my findings below.

UMR first moves for summary judgment on the basis that UMR's determination of benefits available under the Plan was reasonable, and not arbitrary and capricious. Def.'s Mot. at 1–2. Second, UMR argues that Dr. Everett is barred from seeking any benefits at all under the Plan because there is no evidence that the Patient satisfied her mandatory out-of-pocket payment obligations to Dr. Everett under the Plan. *Id.* at 1–2. Dr. Everett moves for summary judgment on the basis that UMR's benefits determination violated Plan language that required claims for covered benefits to be paid according to a "Reasonable Reimbursement" or based on "Usual and Customary" amounts. Pl.'s Mot at 5–12. Dr. Everett argues that UMR's reliance on the Medicare rate—which it characterizes as a discounted rate for in-network providers—was unreasonable and a deviation from standard industry practice to rely on market-based metrics like the "Fair Health" rate. *Id.* at 12–18.

UMR's argument that its final benefits determination was reasonable based on the terms of the Plan fails for two reasons.

***The Language of the Plan***

First, the Plan's language does not contain any reference to the Centers for Medicare and Medicaid Services Physician Fee Schedule, which utilizes a methodology that UMR argues comports with the Plan's requirements. Def.'s Mot. at 16–17. While UMR in essence argues that it has unlimited discretionary authority over benefits determinations because the Plan circularly defines "Reasonable Reimbursement" as "the amount the Plan determines to be the reasonable

13

charge," Def.'s Mot. at 15–16, the process and reasoning underlying a benefits determination must have a basis in the language of the Plan.

For covered benefits, the Plan states that it "establish[es] the allowable payment amount for that service, in accordance with the provisions of this [Summary Plan Description]." SPD at 92. The Plan further states that "[c]laims for covered benefits are paid according to the billed charges, a Negotiated Rate, the Reasonable Reimbursement, or based on the Usual and Customary amounts." *Id.* "Reasonable Reimbursement" is defined as "the amount the Plan determines to be the reasonable charge, allowing for variance of reimbursement among provider types and geographical adjustments where market conditions suggest it appropriate." *Id.* at 117. "Usual and Customary" is defined as "the amount the Plan determines to be the reasonable charge for comparable services, treatment, or materials in a Geographical Area," with "due consideration" "given to the nature and severity of the condition being treated and any medical complications or unusual or extenuating circumstances." *Id.* at 118. There is some overlap in the definitions of "Reasonable Reimbursement," which considers "market conditions," and "Usual and Customary," which looks to "the reasonable charge for comparable services . . . in a Geographical Area." Nowhere in the Summary Plan Description does the Plan mention any external database—either Medicare or Fair Health—as factoring into its calculation of "Reasonable Reimbursement" or "Usual and Customary."

The Second Circuit's analysis of a health insurance plan's coverage of out-of-network services based on a schedule of "usual, customary, and reasonable" fees in *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 618 (2d Cir. 2008) suggests that UMR's benefits determination was arbitrary and capricious because it based its reimbursement on a database not in line with the out-of-network market. In *Krauss*, the Second Circuit considered whether the defendant's application

14

of the "Bilateral Surgery Policy," which set the usual and customary rate of bilateral surgeries to 150% of the reimbursement of a single surgery rather than 200%, was arbitrary and capricious. *Id.* at 628. There, the "Supplemental Certificate of Coverage," which governed care provided by out-of-network providers, stated:

> A UCR schedule is a compilation of maximum allowable charges for various medical services. They vary according to the type of provider and geographic location. Fee schedules are calculated using data compiled by the Health Insurance Association of America (HIAA) and other recognized sources. What We . . . Cover/reimburse is based on the UCR.

*Id.* at 619. Like the definition of "usual and customary" in the Summary Plan Description, the definition of "UCR" in *Krauss* afforded the plan administrator "discretion to employ an amount it deems 'reasonable . . . for a particular Covered Service in the geographical area it is performed.'" *Id.* at 628. In considering the out-of-network claim, the plan administrator calculated plaintiff's reimbursement rate by first taking data from the Health Insurance Association of America (later known as Ingenix) database on how much a single procedure cost in the geographic area. *Id.* That number was then multiplied by 150% in keeping with Medicare's practice of reimbursing bilateral procedures at the rate of 150% of a single surgery. *Id.*

The court's reasoning in *Krauss* is based on the language of the Supplemental Certificate, which explicitly referenced an outside database maintained by the Health Insurance Association of America.[2] Indeed, the district court below observed that "Oxford calculates its UCR caps using

---

[2] As multiple judges in this circuit have noted, United Healthcare Corporation was previously obligated to utilize a database maintained by Fair Health, Inc., an independent, non-profit corporation, to determine the "usual, customary, and reasonable . . . rate for the same services provided by physicians in the same community as the out-of-network physician." *Garber v. United Healthcare Corp.*, No. 15-CV-1638, 2016 WL 1734089, at *1 (E.D.N.Y. May 2, 2016); *Emergency Physician Servs. of New York v. UnitedHealth Grp., Inc.*, No. 20-CV-9183, 2021 WL 4437166, at *2 (S.D.N.Y. Sept. 28, 2021); *Gates v. United Healthcare Ins. Co.*, No. 11-CV-3487, 2014 WL 5800573, at *6 (S.D.N.Y. Nov. 7, 2014). This obligation began in 2009 following a

[HIAA or] Ingenix's database" that contains "data [which] reflects the amounts actually billed to consumers by local providers for particular covered services." *Krauss v. Oxford Health Plans, Inc.*, 418 F. Supp. 2d 416, 428 (S.D.N.Y. 2005), *aff'd*, 517 F.3d 614 (2d Cir. 2008). On appeal, the Second Circuit observed that HIAA data was "a standard industry source" by citing to a New Jersey state law definition of "reasonable and customary" as "a standard based on the Prevailing Healthcare Charges System profile for New Jersey or other state[s] when services or supplies are provided in such state, incorporated herein by reference published and available from . . . Ingenix, Inc." 517 F.3d at 629. The Second Circuit ultimately affirmed the district court's finding that the plan administrator operated within its discretion to calculate its benefits determination by citing to HIAA data and "other recognized sources"—in that case Medicare's bilateral surgery policy. In analyzing the term "reasonable and customary," the court tied that amount to what plan beneficiaries were being charged by providers in a given geographic area.

While it does not appear that the Second Circuit or courts in this circuit have determined whether reimbursement based on the Medicare rate is appropriate when the language of a health insurance plan implies that out-of-network benefits will be based on local market rates, District Judge Terrence Berg considered a similar question of reimbursing out-of-network procedures at pre-negotiated in-network rates in *Zack v. McLaren Health Advantage, Inc.*, 340 F. Supp. 3d 648 (E.D. Mich. 2018). In that case, the plaintiff sued under Section 502(a)(1)(B) after a third-party claims administrator reimbursed only $726.79 on a claim for $27,986. *Id.* at 654. While the health insurance plan in *Zack* did not define "what 'reasonable and customary amount' means or how it

---

settlement with the New York Attorney General's Office and ended in 2015. *See Emergency Physician Servs. of New York v. UnitedHealth Grp., Inc.*, 2021 WL 4437166, at *2.

would be calculated," *id.* at 652–53, the claims administrator based the patient's benefits determination on a median of in-plan negotiated rates. *Id.* at 664.

The *Zack* court concluded that "any method of calculation that contradicts a plain reading of Plan language is arbitrary" because the summary plan description did not provide "any notice to plan participants regarding how the Reasonable and Customary amount is determined." *Id.* at 666. The plan administrator's calculation of benefits based on "negotiated, in-network rates" supported a finding that the benefits determination was arbitrary and capricious because a reasonable person would not read "reasonable and customary" in such a way. *Id.* at 666 (citing *Geddes v. United Staffing All. Emp. Med. Plan*, 469 F.3d 919, 930 (10th Cir. 2006) (observing that "a reasonable, prudent person would never suspect that the "usual and customary" fee for medical services was synonymous with the lower, contractual fee charged by an insurer's in-network physicians")); *HCA Health Service of Georgia, Inc. v. Emps. Health Ins. Co.*, 240 F.3d 982, 997 (11th Cir. 2001) ("[W]e disagree that the discounted fee is the fee recognized by a prudent person. Common sense dictates that the fee recognized by a prudent person is the usual and customary fee in the industry."). Ultimately, the *Zack* court remanded the claim back to the plan administrator to reconsider the claim "using a definition that is based on the prevailing market rate generally charged for the service in the relevant geographic area." *Id.* at 668.

Unlike the out-of-network provisions in *Krauss* that specifically referenced "data compiled by the Health Insurance Association of America," the Summary Plan Description does not reference any external sources. Therefore, following *Zack*, my analysis of the Plan Administrator's benefits determination is based on how a reasonable person would interpret the Plan's requirements.

The Summary Plan Description provides no suggestion that out-of-network claims will be priced according to a percentage of Medicare fee schedules. Instead, the language surrounding out-of-network reimbursement states that the Plan Administrator will calculate its discretionary determination by making "geographical adjustments" based on "market conditions" surrounding "comparable services." Indeed, health insurance plans processing out-of-network claims regularly distinguish between payment methods that reimburse based on "a percentage . . . of the Medicare allowed charge for the same or similar service" or "pricing based upon a nationwide provider reimbursement database." *See, e.g., Neurological Surgery, P.C. v. Travelers Co.*, 243 F. Supp. 3d 318, 323 n.4 (E.D.N.Y. 2017). Therefore, I find that a reasonable person would not take Medicare fee schedules, which do not reflect the market conditions of out-of-network providers and are preestablished through administrative rulemaking, to conform with the Summary Plan Description's general definitions of "Reasonable Reimbursement" and "Usual and Customary." *See Gates v. United Healthcare Ins. Co.*, No. 11 CV 3487, 2013 WL 1718914, at *4 (S.D.N.Y. Apr. 19, 2013) (describing Medicare physician fee schedule as "the amounts that Medicare has determined are the maximum amounts for a particular service"). The language of the Plan supports a finding that the Plan Administrator's benefits determination was unreasonable.

### *The Administrative Record*

Second, the other materials contained in the administrative record—including records of correspondence between Dr. Everett and UMR, Change Healthcare, and Clear Health—do not suggest that the use of the Medicare rate was reasonable. For this analysis, I look to Exhibit B, which includes records related to communications between the Patient, Dr. Everett, and UMR and its affiliates. ECF No. 46-5. Following the arbitrary and capricious standard, I look to whether there is any substantive evidence that UMR's benefits determination at 150% of the Centers for

18

Medicare and Medicaid Services rate was a "Reasonable Reimbursement" or "Usual and Customary" based on the Plan's terms.

As a preliminary matter, I must distinguish between the reasons provided in the administrative record and characterizations of the administrative record provided in briefing. In its affirmative motion, UMR argues that the "CMS Physician Fee Schedule rates satisfy the definition of Reasonable Reimbursement under the Plan" because the Centers for Medicare & Medicaid Services website states that the fee schedules apply "[g]eographic adjusters . . . to adjust for variation in resource cost by geographic area." Def.'s Mot. at 16–17. However, the administrative record does not support UMR's argument that the Medicare fee schedule reflects "variation[s] in resource cost by geographic area" and satisfied the Plan's definition of "Reasonable Reimbursement" because none of this reasoning was ever communicated to Dr. Everett. Indeed, it does not appear that Dr. Everett was aware that Clear Health's pricing methodology was based on a percentage of Medicare rates until sometime between July 1, 2021 and November 10, 2021. Claim File at 15; Def.'s 56.1 ¶¶ 51, 54. The notes from the November 10, 2021 call, while abbreviated and disjointed, suggest that UMR itself was unaware of the pricing methodology used by its third-party pricing vendors at that point:

> why rep[r]iced this way, claire [clear]/change healthcare is saying the [patient's] plan is 150% of medicare rate, explained we do not see the contracts, it is paid under the benefits of u&c [usual and customary] of the discounted rate [of 70% for out-of-network providers], i show nothing showing the plan is 150% of medicare rates

Claim File at 12. Indeed, this portion of the administrative record suggests that there was "nothing showing" that the Plan was to be based on "150% of medicare rate." *Id.* The lack of formal documentation setting out why and how UMR, Change Healthcare, and Clear Health applied Medicare fee schedules to make its benefits determination according to the terms of the Plan supports a finding that the determination was arbitrary and capricious. *See Zack*, 340 F. Supp. 3d

at 668 (finding denial of benefits was arbitrary and capricious because "the Plan failed to provide a definition of Reasonable and Customary" and provided "no explanation of the meaning of this term . . . during the benefit or appeal process"). Here, the explanation of benefits letters provided only circular definitions of reasonableness that suggested that the Plan Administrator's determination was reasonable because it was the Plan Administrator's determination under the terms of the Plan. Claim File at 24–26. Without any information as to why the claim was priced the way it was, Dr. Everett had no way to effectively appeal this decision.

In a similar context, the court in *Nathanial L. Tindel, M.D., LLC v. Excellus Blue Cross Blue Shield*, No. 5:22-CV-971, 2024 WL 4198368 (N.D.N.Y. Sept. 16, 2024), remanded an ERISA denial of benefits claim after review of the administrative record suggested that the plan administrator did not consider whether a procedure was an emergency service. *Id.* at *12–13. There, the defendant's letter upholding the benefits determination "did not explain why the 'emergency room services' were not considered Emergency Services and thus fully covered." *Id.* at *13. The court found that "[w]ithout any reason provided" it was "impossible for the Court to evaluate 'whether the decision was based on consideration of the relevant factors.'" *Id.* (citing *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995)). Here, the letters from UMR to Dr. Everett and the Patient only state that the "claim was priced based on the maximum allowable amount per the plan and was processed according to plan benefits." Claim File at 24–26. Remand to the plan administrator is appropriate because it does not appear from the call notes, internal claim notes, explanation of benefits, and UMR's letters responding to Dr. Everett's inquiries that any decision making was based on relevant factors under the Plan.

While "the administrator's interpretation must be allowed to control" where "both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan

20

provisions," neither URM nor Dr. Everett have presented a rational interpretation of the Plan in the administrative record. *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 93 (2d Cir. 2000) (alterations adopted and quotations omitted). The terms "Medicare" and "Fair health rate" each appear only once in the administrative record in relation to the proper benefits determination under the plan. Claim File at 12, 14. "Nevertheless, where the administrator . . . interprets the plan in a manner inconsistent with its plain words, . . . its actions may well be found to be arbitrary and capricious." *Id.* Here, UMR's threadbare interpretation of the Plan in the administrative record was inconsistent with the Plan's plain words. Therefore, the Patient's benefits determination was arbitrary and capricious.

## II. Waiver of Patient's Payment Obligation

Defendant UMR additionally argues that it is entitled to summary judgment because it alleges that Dr. Everett waived the Patient's mandatory out-of-pocket expenses, and that such waiver renders any claim defective under the Plan's terms. Def.'s Mot. at 18–19. UMR points to the Plan's "Plan Participation" provision for services provided by out-of-network providers, which requires "the Plan to pay 70% of the Covered Expenses and the Patient to pay 30% of the Covered Expenses." *Id.* at 18. In short, UMR argues that it is not obligated to provide "*any benefits* under the Plan" because Dr. Everett did not allege or provide evidence that the Patient paid 30% of the Covered Expense—which it argues is 30% of $2,132.54 or $639.76—and therefore Patient is responsible for the payment of the entire claim. *Id.* at 19. Defendant cites to paragraph 13 of the Amended Complaint for the proposition that the only amount Dr. Everett received in payment for the services rendered was the $1,492.78 from UMR. *Id.*

Dr. Everett responds with four arguments. First, he argues that the Plan only requires a Patient's payment of the deductible to receive payment for covered expenses. Pl.'s Opp. at 19.

Second, he argues that the language of the Plan states that a claim "may" be denied or reconsidered if a provider waives required out-of-pocket expenses, and that such language is "permissive" rather than "mandatory." *Id.* at 20–21. Third, Dr. Everett argues that UMR's payment, while insufficient, suggest that it already exercised its discretion to not withhold payment under this provision. *Id.* Finally, Dr. Everett argues that UMR's citations to the Amended Complaint do not actually support its proposition that the Patient did not pay her share of out-of-pocket expenses.

UMR's argument based on Patient's alleged failure to fulfill out-of-pocket expenses fails for two reasons. First, paragraph 13 of the Amended Complaint simply states that "Defendants issued reimbursement in the amount of $1,492.78." AC ¶ 13. That UMR issued a reimbursement of a certain amount does not necessarily imply that the Patient did not pay any out-of-pocket expenses, which the Plan defines to include "Deductibles, Co-pays or required Plan Participation." In other words, neither the Amended Complaint nor the administrative record support the inference that the Patient has not satisfied her out-of-pocket expenses. Second, in bringing this action, Dr. Everett stands in the shoes of the Patient because "[h]ealthcare providers who receive valid assignments of the right to reimbursement from their patients have standing to sue under ERISA." *Garber v. United Healthcare Corp.*, No. 15-CV-1638, 2016 WL 1734089, at *3 (E.D.N.Y. May 2, 2016) (citing *Simon v. General Elec. Co.*, 263 F.3d 176, 177-78 (2d Cir. 2001)). Logic dictates that the Patient and Dr. Everett would seek to determine the proper benefits determination they are owed from UMR before settling their obligations to each other. Until the total value of covered expenses is determined, Dr. Everett would have no way of calculating his Patient's obligation for 30% of the covered expense.

Finally, this action does not turn on Patient's satisfaction of out-of-pocket expenses. Looking at the language of the provision in question, the Summary Plan Description states that,

"[i]f a provider waives the required out-of-pocket expenses," "the Covered Person's claim may be denied and the Covered Person will be responsible for payment of the entire claim[.]" SPD at 26. Here, the Patient's claim has been approved by UMR, and the remaining dispute is whether the Plan Administrator's calculation of the reimbursement due was reasonable.

## III. Remedy

The Second Circuit has stated that remand for reconsideration is the typical remedy for a plan administrator's abuse of discretion, unless a court "conclude[s] that there is no possible evidence that could support a denial of benefits." *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 490 (2d Cir. 2013) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1074 (2d Cir. 1995)).

Even though I conclude that the Plan Administrator's finding was arbitrary and capricious, I will not "substitute my own judgment" for the Plan Administrator's. *Id.* I therefore remand Dr. Everett's claim back to defendant UMR. Upon remand, UMR must provide a specific explanation of the reasonable and customary fee calculation in any subsequent benefit or appeal adjudication. Here, because the Plan does not provide a definition of the term "usual and customary" that references any specific calculation methodology beyond what "the Plan determines to be the reasonable charge for comparable services . . . in a Geographical Area," this term must be interpreted on remand according to the term's ordinary meaning—that is, an amount determined based on the prevailing market rates for out-of-network procedures in the relevant geographical area.

## CONCLUSION

For the reasons above, I deny defendant's motion for summary judgment, grant plaintiff's cross-motion for summary judgment, and remand the claim back to the Plan Administrator. UMR

must interpret "usual and customary" on remand based on the prevailing market rates for the procedure in the relevant geographical area.

SO ORDERED.

                                                  _____/s/_____

                                                  Allyne R. Ross
                                                  United States District Judge

Dated: October 27, 2025
       Brooklyn, New York